[1] Bob Riley succeeded Don Siegelman as Governor. Rule 43(b), Ala.R.App.P., provides that when an officeholder leaves office, the successor is automatically substituted.
This taxpayer lawsuit challenges the expenditure of funds for a proposed alteration of the grounds and streets in front of the state capitol. This case presents three issues: whether the plaintiff, Roger Broxton, presented substantial evidence indicating that state moneys were being used in the proposed alteration, thereby authorizing him, as a state taxpayer, to sue; *Page 377 
whether payments made using state funds, but which are then reimbursed by federal money, constitute the use of state funds; and whether Broxton has standing to sue if only federal funds are used. Because we agree with the judgment of the trial court, we affirm.[2]
 Facts
On January 14, 2002, Broxton, a resident and taxpayer of the State of Alabama, sued Don Siegelman, then Governor of the State of Alabama; Dr. Lee H. Warner, executive director of the Alabama Historical Commission; and Bill Pryor, attorney general of the State of Alabama, in the Montgomery Circuit Court, alleging that proposed changes in the landscaping in front of the state capitol, which included narrowing Bainbridge Street in front of the capitol, removing the parking areas on both sides of Dexter Avenue in front of the capitol, and modifying the slope of the hill leading to the capitol (hereinafter referred to as "the landscaping project"), violated the provisions of § 41-9-261, Ala. Code 1975, which provides, in part, that "[t]he primary restoration, planning and preservation responsibility for the State Capitol of Alabama and its contiguous historic grounds, designated by the United States government as a national historic landmark, is hereby delegated to the Alabama Historical Commission."
In his complaint, Broxton alleged:
 "According to the minutes of its meetings and its web site, the Alabama Historical Commission has voted to extend the Alabama Capitol Grounds into Bainbridge Street and to alter the slopes of the Capitol Grounds, citing [§ 41-9-261, Ala. Code 1975,] as [its] authority for this action. Governor Don Siegelman has approved these changes. Therefore, the Commission could begin construction at any moment. The Commission's official reason for this action is to make the Capitol Grounds `user friendly,' a reason not authorized by law.
 "The extension of the Alabama Capitol Grounds into Bainbridge Street and the altering of the slopes of the Capitol Grounds will result in the unlawful expenditure of substantial public funds; $5.8 million, according to the Alabama Historical Commission. . . ."
Broxton asked that the trial court declare that the proposed actions "threaten" to violate § 41-9-261, Ala. Code 1975, and that it enjoin the governor and the Alabama Historical Commission from changing the boundaries of the capitol grounds *Page 378 
and from altering the slope of the capitol grounds.
Dr. Warner and then Governor Siegelman answered the complaint; Attorney General Pryor filed a motion to dismiss him as a party. Attorney General Pryor's motion to dismiss was granted on March 27, 2002.[3] On April 16, 2002, then Governor Siegelman and Dr. Warner (hereinafter referred to collectively as "the defendants") filed a joint motion for a summary judgment, on the ground that Broxton lacked standing to bring the action. They alleged that because Broxton's standing for filing the complaint was based on his status as a state taxpayer he lacked standing because, they argued, the money to be used for the landscaping project was federal, not state, money. The defendants attached an affidavit from Mark Driscoll, director of historical sites for the Alabama Historical Commission. In that affidavit, Driscoll stated:
 "All funds to be expended on the modification of the landscaping of the Capitol grounds, including the narrowing of Bainbridge Street and the alteration of the western slope of Capitol Hill, will come from a Transportation Enhancement grant from the Federal Highway Administration which will be received by the Alabama Historical Commission through the Alabama Department of Transportation. The source of these funds is therefore federal taxes."
On April 25, 2002, Broxton filed an amended complaint; in that complaint he alleged that in addition to being a citizen and taxpayer of Alabama, he was a citizen and taxpayer of the United States. The amended complaint stated: "Roger Broxton sues in his individual capacity as a United States citizen, United States taxpayer, Alabama citizen and Alabama taxpayer." On May 8, 2002, the defendants filed a renewed motion for a summary judgment arguing that Broxton's "claimed status as a federal taxpayer does not protect his case from summary judgment because there is no recognized action under Alabama law for a federal taxpayer to challenge the legality, under state law, of the expenditure of federal funds" and that "[i]n this regard the Amended Complaint fails to state a claim for which relief can be granted." The defendants concluded by stating that "[t]he plaintiff thus has no status to challenge the expenditure of the [federal] funds here either as a state taxpayer or as a federal taxpayer."
The motion for a summary judgment was set for hearing on June 19, 2002, and the case was set for trial on July 1, 2002. On June 6, 2002, the defendants filed the affidavit of John Powell, the contracts and grants administrator for the Alabama Historical Commission, in support of their renewed motion for a summary judgment. In his affidavit, Powell stated:
 "The Capitol Landscaping Project is a state project that is funded by Federal Transportation Enhancement grant funds, which come to the State of Alabama from the Federal Highway Administration. The source of the funding for this project . . . is controlled by an initial agreement and a supplemental agreement between the state agencies involved — the [Alabama Historical] Commission, the State Department of Finance, and the State Department of *Page 379 
Transportation. Under the initial agreement, entered into in September 2000, all of the amount covered by that agreement, $250,000, was to be federal funds, with no state funds involved . . . . Under the supplemental agreement, entered into in April 2001, the entire amount of the project, approximately $5.69 million, was to come from federal funds, with no state funds involved . . . . This funding scheme would cover expenditures for the entire project, including all expenditures that have occurred up to now and all future expenditures."
Powell concluded by stating: "According to the agreements between the state agencies involved in this project, all expenditures on the project, including those to be made in the future, will come solely from federal funds. No state funds will be used in this project." Attached to the affidavit were copies of the initial agreement dated September 20, 2000, and the supplemental agreement dated April 26, 2001. Also attached to the affidavit was an invoice directed to the Alabama Department of Transportation showing that $199,730.98 of the funds had already been reimbursed from federal funds and that only $54,554.62 remained to be paid.
On June 14, 2002, Broxton submitted his statement in opposition to the defendants' motion for a summary judgment, in which he made the following arguments to the trial court: (1) that the defendants did not adequately document their claim that federal funds had been used to reimburse the Alabama Historical Commission for funds expended on the landscaping project; (2) that, contrary to the defendants' assertion, state funds had been used and would be used on the landscaping project, because state money would first be paid to suppliers and then would be reimbursed from federal funds; and (3) that Broxton had standing to challenge the landscaping project regardless of whether state or federal funds were used. Broxton attached various documents that the defendants had produced during discovery. Those documents included: vouchers paid to an architect, purporting to show that state funds had been used to pay the architect; a letter from then Governor Siegelman to Dr. Warner postponing the landscaping project, "until the State of Alabama is in a better financial position to continue the review and discussion of your recommendations"; an undated handwritten note to Elizabeth Brown, a former acting director of the Alabama Historical Commission, stating that Richard Rybka, an architect, is "to be paid from another source of funding and will not be included in the federally aided transportation enhancement project"; and various other documents, letters, and copies of state and federal laws and regulations.
In response, the defendants filed a motion to strike; they attached to their motion the affidavits of Elizabeth Brown and Lamar McDavid, director of the bureau of finance of the Alabama Department of Transportation. In arguing their motion they specifically pointed out that the handwritten note was in fact a draft of a letter and was inadmissible on the ground of hearsay, because the draft was undated, there was no indication that the draft was ever sent, and the draft was irrelevant because the words "to be paid from another source of funding," did not indicate that state funds would be used.
In her affidavit, Elizabeth Brown stated that she was the former acting director of the Alabama Historical Commission and the present director of the historic preservation division of the Alabama Historical Commission and that Richard Rybka, an architect with Veterans Landscaping, performed certain services as a part of a project unrelated to the landscaping *Page 380 
project, and that there were no future plans to use the services of Rybka in connection with the landscaping project.
In his affidavit, McDavid stated that eight requests for reimbursement for various amounts had already been submitted to the Federal Highway Administration, and that, at the time of the affidavit, seven of those requests had been paid.
On June 19, 2002, the trial court held a hearing on the motion for a summary judgment, and on August 14, 2002, filed its order; that order stated, in pertinent part:
 "The Defendants having filed a motion for summary judgment, the matter came before the Court for hearing on June 19, 2002. After hearing argument and considering the affidavits and other exhibits filed by both parties, the Court makes the following findings:
 "1. The complaint as originally filed was based upon [Broxton's] status as a state taxpayer and sought to enjoin the expenditure of state funds on certain aspects of a landscaping project affecting the Capitol grounds. The Defendants, Don Siegelman, [then] Governor of Alabama, and Dr. Lee H. Warner, Executive Director of the Alabama Historical Commission, filed for summary judgment on the ground that the money to be spent on the challenged activities would be federal funds from a federal grant. In response, [Broxton] amended his complaint to assert in addition his status as a federal taxpayer.
 "2. If the money to be used here is in fact from federal funds, [Broxton], under his original complaint lacks standing to challenge the expenditure of this money. The amendment of the complaint to include [Broxton's] status as a federal taxpayer does not grant standing to [Broxton] because taxpayer lawsuits under Alabama law appear to be limited to state taxpayers challenging the expenditure of state funds.
 "3. The affidavits and supporting exhibits filed by the Defendants show that the overall project of which the challenged activities are a part is governed by a contract between three state agencies — the Alabama Historical Commission, the Department of Finance, and the Department of Transportation — and that all spending under that contract will ultimately come from federal funds. Under the contractual scheme, the Alabama Historical Commission will pay contractors from its funds, and then seek reimbursement from the Department of Transportation, which will in turn request reimbursement from the Federal Highway Administration. The contract makes clear that all future spending for this project will come ultimately from federal funds and thus all cost will be to the federal government; for this reason there is no state spending to enjoin.
 "For the above reasons the Court holds that there is no dispute as to material fact, that the challenged activities will involve federal funds only, that [Broxton] lacks standing, and that the Defendants are entitled to judgment in their favor as a matter of law. Accordingly, it is hereby Ordered that judgment is entered in favor of the Defendants and against [Broxton]."
Broxton filed a motion to vacate the judgment on September 11, 2002; that motion was denied on September 16, 2002. Broxton then timely filed this appeal.
 Standard of Review
The standard of review for a summary judgment has been stated many times. In Rosen v. Montgomery Surgical Center, 825 So.2d 735, 737 (Ala. 2001), this Court stated: *Page 381 
"Our review of a summary judgment is de novo.
 "`In reviewing the disposition of a motion for summary judgment, "we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact," Bussey v. John Deere Co., 531 So.2d 860, 862
(Ala. 1988), and whether the movant was "entitled to a judgment as a matter of law." Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990).'
"Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997)."
 I.
Both parties agree that a taxpayer has standing to sue where the taxpayer is challenging the expenditure of state funds, see, e.g., Huntv. Windom, 604 So.2d 395 (Ala. 1992). But the parties disagree on the question whether Broxton offered substantial evidence indicating that state funds were being used, which is critical to our resolution of the question of standing to sue. In considering the issue of standing to sue, we will first address the question whether state funds were used in the landscaping project, which will necessarily address the question whether a plaintiff has standing to challenge the state's use of federal funds.
Broxton argues:
 "The only fact asserted by defendants (movants) in their Narrative Summary of Facts in their Motion for [a] Summary Judgment is: `The money which will be used for this project, however, will come entirely from a federal grant from the Federal Highway Administration.' The defendants have failed to produce the above federal grant and admit that no grant application was submitted, although they signed an agreement that it had been developed, submitted and approved. Thus, the primary fact set forth in the defendants' narrative summary of facts is in dispute from the outset, because the trier of fact is asked to believe that a federal grant, which is completely absent from the record, having no particular terms and description, has been bestowed upon the Alabama Historical Commission without any written grant application that describes the project to be funded.
". . . .
 "The total evidence offered by the defendants as [a] prima facie [case] were affidavits and accompanying documents of Mark Driscoll, John Powell and Lamar McDavid and were offered only for the purpose of proving the alleged material fact of 100% funding from a federal grant for the Capitol Project, which was the sole basis of the defendants' motion for [a] summary judgment. Rule 56(e) [Ala.R.Civ.P.] requires that Driscoll's, Powell's, and McDavid's `affidavits shall *Page 382 
be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' Driscoll's, Powell's, and McDavid's affidavits do not meet these requirements and render the defendants' motion for [a] summary judgment improperly supported."
(Broxton's Reply Brief, pp. 3-4.) The defendants argue that "[t]he Powell affidavit,[4] together with the initial and supplemental agreements, shows that the state agencies involved have agreed, in a document binding among themselves, that no state funds will be used." The defendants also argue that Lamar McDavid's affidavit provides additional verification that all funds used for the landscaping project have been or will be federal funds.[5] They argue:
 "This submission establishes the Defendants' prima facie case and shifts to *Page 383 
Broxton the burden of showing that state funds were actually expended. This Broxton did not do."
We agree with the defendants' argument. The affidavits presented by the defendants are clear and unequivocal. They are based on the personal knowledge of the affiants, and they specifically state that no state funds have been or will be used on the landscaping project. Broxton offered no evidence to contradict the evidence presented by the defendants in support of their motion for a summary judgment, and as we view the state of the record, he offers only his dissatisfaction with the quality of the evidence, arguing that "there was never so much as an application for a federal grant completed and filed with any agency by the [Alabama Historical] Commission . . ., much less a documented federal grant describing the project," and that the "[d]efendants expressly admit in documents produced by the defendants in response to discovery that no application or other description was provided to federal authorities." (Broxton's Reply Brief, p. 7.) Applying the de novo standard of review, we cannot say that the trial court erred in finding that only federal funds were used in the landscaping project.
 II.
Broxton next argues that the Alabama Historical Commission's use of state funds, which are subsequently reimbursed with federal funds, constitutes an expenditure of state funds. Both parties agree that a taxpayer of the State of Alabama may file an action challenging what the taxpayer believes to be an illegal expenditure of state funds. This Court has recognized the right of a taxpayer to challenge the improper use of state funds. In Turnipseed v. Blan, 226 Ala. 549, 148 So. 116 (1933), this Court stated:
 "We have recognized the right of a taxpayer to maintain a suit in equity to restrain an officer of a city or county from disbursing funds without statutory authority or under an unconstitutional statute. Travis v. First National Bank of Evergreen, 210 Ala. 620, 98 So. 890 [(1924)]; Allen v. Intendant Councilmen of La Fayette, 89 Ala. 641, 8 So. 30, 9 L.R.A. 497 [(1890)]. Some states refuse to concede such right of action when the purpose is to enjoin a state officer from thus illegally disbursing state funds. But a great majority of the states which have considered the subject have applied such right of suit, though it relates to a state officer. This is said to be based upon the necessity for prompt action to prevent irremediable public injury. The taxpayer bears the same relation to state funds as to municipal funds, except in degree, a point which should not control. 58 A.L.R. 588 et seq., note."
226 Ala. at 552, 148 So. at 118. In Hall v. Blan, 227 Ala. 64, 148 So. 601
(1933), this Court stated that "[a] taxpayer may maintain a suit to enjoin the state treasurer from diverting public funds, or disbursing same for unlawful purposes. He has a direct interest in seeing that taxes paid are devoted to the ends provided by law." 227 Ala. at 73,148 So. at 607. In Goode v. *Page 384 Tyler, 237 Ala. 106, 109, 186 So. 129, 131 (1939), this Court stated:
 "[T]his Court is committed to the doctrine that a taxpayer may maintain a suit in equity to restrain a state officer in the unlawful disbursement of state funds. Turnipseed v. Blan, 226 Ala. 549, 148 So. 116
[(1933)]; Hall v. Blan, 227 Ala. 64, 148 So. 601
[(1933)], and authorities therein cited.
 "Defendants insist this principle is here inapplicable as the agricultural fund does not contain taxes in the general sense and as derived from a general revenue bill.
 "But we think the argument too greatly restricts the right of a taxpayer to maintain such a suit. As we have observed complainant pays general taxes as well as some of the very taxes imposed by the Agricultural Code, and this code not only provides for fees and stamp taxes and the like, but license taxes also. In a very broad sense these are forms of taxation (37 Corpus Juris 168, 169; 61 Corpus Juris 65 and 107) sufficient in the instant case to justify the maintenance of this suit by this complainant."
In Hunt v. Windom, 604 So.2d 395 (Ala. 1992), this Court stated:
 "[I]n Zeigler v. Baker, 344 So.2d 761 (Ala. 1977), . . . this Court held that [a taxpayer's challenge] would lie and stated:
 "`In a long line of decisions this Court has recognized the right of a taxpayer to challenge, either as unconstitutional or as not conforming to statute, the expenditure of public funds by county officers. Court of County Revenues v. Richardson, 252 Ala. 403, 41 So.2d 749 (1949); Poyner v. Whiddon, 234 Ala. 168, 174 So. 507 (1937); Thompson v. Chilton County, 236 Ala. 142, 181 So. 701
(1938); Travis v. First Nat. Bank of Evergreen, 210 Ala. 620, 98 So. 890 (1924); Reynolds v. Collier, 204 Ala. 38, 85 So. 465 (1920). The right of a taxpayer to challenge the unlawful disbursement of state funds likewise is unquestioned. Goode v. Tyler, 237 Ala. 106, 186 So. 129 (1939) (". . . this Court is committed to the doctrine that a taxpayer may maintain a suit in equity to restrain a state officer in the unlawful disbursement of state funds."); Hall v. Blan, 227 Ala. 64, 148 So. 601
(1933); Turnipseed v. Blan, 226 Ala. 549, 148 So. 116
(1933). The latter two cases dealt with the constitutionality of disbursements, while Goode
involved expenditures to be made under purported statutory authority. The Supreme Court of Illinois wrote to this principle in Fergus v. Russel, 270 Ill. 304, 110 N.E. 130 (1915):
 "`"We have repeatedly held that taxpayers may resort to a court of equity to prevent the misapplication of public funds, and that this right is based upon the taxpayer's equitable ownership of such funds and their liability to replenish the public treasury for the deficiency which would be caused by the misappropriation."'
"344 So.2d at 763-64.
 "More recently, in Lee v. Bronner, 404 So.2d 627
(Ala. 1981), the Court again rejected the argument that only the Governor or the attorney general may bring an action to challenge the illegal expenditure of state funds, and in that case the Court quoted from Zeigler v. Baker, supra:
 "`"If a taxpayer does not launch an assault, it is not likely that there will be an attack from any other source, because the agency involved is usually in accord with the expenditure. There may be instances in which the affected public official might pursue the matter. The Attorney General *Page 385 
would be an appropriate officer to bring such a suit, but in some instances this is not done and it is in such cases that it is only the taxpayer's attack which preserves the public treasure."'
 "404 So.2d at 629 (Zeigler was quoting from Department of Administration v. Horne, 269 So.2d 659 (Fla. 1972))."
604 So.2d at 396-97 (emphasis added).
Broxton argues that "[t]he major controlling factor of this Capitol [Landscaping] Project is the initial disbursement of State funds, not federal funds reimbursement," and that "state funds were used (expended) and remained unreimbursed for a period of 4 to 7 months before being allegedly reimbursed with federal funds." (Broxton's Reply Brief, p. 19, emphasis in original.) The defendants counter this argument by stating that "[t]axpayer lawsuits challenge the expenditure of state tax funds . . . . While state funds are somehow utilized in reimbursement, they are not ultimately expended because they are replaced by federal funds." (Defendants' Brief, p. 11.)
We agree with the position argued by the defendants. As stated above, the right of a taxpayer to sue "`"is based upon the taxpayer's equitable ownership of such funds and their liability to replenish the publictreasury for the deficiency which would be caused by the misappropriation."'" Hunt v. Windom, 604 So.2d at 396-97 (quoting Zeiglerv. Baker, 344 So.2d 761, 763 (Ala. 1977), quoting in turn, Fergus v.Russel, 270 Ill. 304, 314, 110 N.E. 130, 135 (1915)).
As we view the holdings of our cases, it is this liability to replenish the public treasury through the payment of taxes that gives a plaintiff in a taxpayer's action standing. In this case, it is clear that federal funds were used to replenish the state funds that were temporarily used; because the taxpayer will not face the liability of replenishing the state funds, the trial court did not err in holding that Broxton does not have standing to sue. Broxton also argues that state funds are used, because at the moment of the reimbursement, the federal funds become state funds, and the property of the state. Again, this argument must fail, because as stated above, it is the liability to replenish public funds that gives a taxpayer standing to sue, and there is no question that here there is no liability to replenish state funds.
 III.
Broxton further argues that he has standing to sue where a state official uses or expends federal funds in violation of state or federal law. Broxton cites Alabama State Board of Education v. McClain,810 So.2d 773 (Ala. 2001), as authority for the proposition that he has standing to sue when a case "involv[es] the expenditure of only federal funds by a state agency." He argues as follows:
 "In E.B. McClain v. Alabama State Board of Education, CV 96-1341, 1998, [Ex parte Alabama State Board of Education, 810 So.2d 773 (Ala. 2001)] the same Circuit Court for Montgomery County that denied plaintiff Roger Broxton standing to challenge the use of federal funds, granted standing to E.B. McClain to challenge the use of federal funds. In his Statement In Opposition to Motion For Summary Judgment, E.B. McClain stated `this case is analogous to the taxpayer cases involving an unlawful disbursement of funds rather than a collection of taxes.' Although the standing issue was not tried in this Court, E.B. McClain was allowed standing in this Supreme Court to be heard concerning his motion for attorney fees."
(Broxton's Reply Brief, p. 32.) Broxton also cites Hunt v. Windom, supra; Zeigler v. Baker, supra; and Powers v. United States Fidelity Guaranty Co., *Page 386 236 Ala. 389, 182 So. 758 (1938), to support his contention that "it is the unlawful disbursement or expenditure of funds that have become property of the State, and not the source of funds, whether originally from federal, state or other sources that allows a taxpayer standing in Alabama courts." (Broxton's Brief, p. 16.)
As we view our caselaw, the requirement for standing in a taxpayer lawsuit is the expenditure of state funds, as spelled out in Hunt v.Windom, supra. As we understand Broxton's argument, he claims that the reimbursement here is contrary to federal statutory and regulatory guidelines, even though the reimbursement has already occurred. It would appear to us, as the defendants argue, that "[t]he question of standing here turns upon an issue of fact: are state funds to be expended on this project?" Based on the record before us, we do not believe that there is any evidence to show that the funds expended for the landscaping project were "state funds," as that term is used in our cases.
Based on the foregoing, we hold that it is the "liability to replenish the public treasury through the payment of taxes that gives a [taxpayer] plaintiff standing," not the mere expenditure of funds, regardless of their source. For that reason, we hold that the trial court did not err in holding that Broxton lacks standing, and we affirm its judgment.
This opinion was prepared by retired Justice Hugh Maddox, sitting as a Justice of this Court pursuant to § 12-18-10(e), Ala. Code 1975.
AFFIRMED.
MOORE, C.J., and SEE, BROWN, HARWOOD, and STUART, JJ., concur.
[2] Broxton also argues that the proposed project violates both state and federal law and that it constitutes an unlawful use of state land. Because we affirm the judgment of the trial court that Broxton lacks standing to sue, we do not address those arguments.
We note that the defendants, then Governor Siegelman and Dr. Lee Warner, filed a motion to dismiss this appeal for lack of jurisdiction because of an alleged absence of a justiciable controversy. In their motion, the defendants alleged that on January 17, 2002, then Governor Siegelman "had decided not to approve . . . the landscaping project at that time and was ordering the [Alabama Historical] Commission to suspend all recommendations regarding the proposed changes until the financial position of the State had improved." The defendants further alleged that the Alabama Historical Commission has halted all work and that "no payments to contractors are anticipated until the Governor authorizes further work." Further, the defendants stated that "[t]his Court may take judicial notice of the [election of Governor Riley] on November 5, 2002," and "[b]ecause the responsibility for any future decision as to the landscaping project will soon be in the hands of Governor-elect Riley, it cannot be said whether approval of the landscaping project will be forthcoming in the near future or ever."
This Court denied the motion to dismiss the appeal on January 9, 2003.
[3] Attorney General Pryor's motion to dismiss stated:
 "Bill Pryor, the Attorney General of Alabama, has no authority or role in the activities authorized under § 41-9-261 either under that section or under any other provision of law, and [Broxton] in his complaint makes no claims to the contrary. In the complaint [Broxton] states only that Bill Pryor is served pursuant to Rule 4 of the Rules of Civil Procedure and not that he is a proper party to this action."
[4] John Powell's affidavit reads as follows:
 "1. I am the Contract and Grants Administrator for the Alabama Historical Commission . . . and have held this position since August 31, 1984. Among my duties in this position is to administer funds coming to the [Alabama Historical] Commission and to ensure compliance with the terms of the particular grant agreement. I have personal knowledge of the facts contained in this affidavit.
 "2. The Capitol Landscaping Project is a state project that is funded by Federal Transportation Enhancement grant funds, which come to the State of Alabama from the Federal Highway Administration. The source of the funding for this project . . . is controlled by an initial agreement and a supplemental agreement between the state agencies involved — the [Alabama Historical] Commission, the State Department of Finance, and the State Department of Transportation. Under the initial agreement, entered into in September 2000, all of the amount covered by that agreement, $250,000, was to be federal funds, with no state funds involved . . . . Under the supplemental agreement, entered into in April 2001, the entire amount of the project, approximately $5.69 million, was to come from federal funds, with no state funds involved . . . . This funding scheme would cover expenditures for the entire project, including all expenditures that have occurred up to now and all future expenditures.
 "3. Under the agreements suppliers send bills to the [Alabama Historical] Commission, where they are reviewed and paid if in order. After payment the [Alabama Historical] Commission seeks reimbursement from the Alabama Department of Transportation; under the agreement this reimbursement would come from federal funds. Preparing requests on behalf of the [Alabama Historical] Commission for reimbursement falls within my duties as Contracts and Grants Administrator.
 "4. As of the date of this affidavit a total of $254,285.60 has been paid to suppliers for work on this project. As is shown by the request for reimbursement submitted by the [Alabama Historical] Commission to the Department of Transportation, all of this reimbursement was to come from federal funds . . . .
 "5. According to the agreements between the state agencies involved in this project, all expenditures on the project, including those to be made in the future, will come solely from federal funds. No state funds will be used in this project."
[5] Lamar McDavid's affidavit states:
 "1. I am the Director of the Bureau of Finance of the Alabama Department of Transportation. The Bureau of Finance has the responsibility for submitting to the Federal Highway Administration requests for reimbursement for expenditures to be funded by grants from that federal agency, including Transportation Enhancement Grants. In my service as the Director of the Bureau of Accounts and Finance I have gained personal knowledge of the matters contained in this affidavit.
 "2. Attached to this affidavit . . . is a copy of a computer spreadsheet which displays the record of billing and receipts for reimbursement between the Department of Transportation and the Federal Highway Administration for the Capitol Landscaping Project, Project No. STPTE-0099(66) and STPTE-0099(66)S-1. The computer data that this reflects and this computer printout of this data constitute the official record of these transactions of the Department of Transportation.
 "3. [The computer spreadsheet] shows that eight requests for reimbursement for various amounts have been made by the Department of Transportation to the Federal Highway Administration, and that reimbursements have been received for seven of these requests. These reimbursements represent reimbursement from federal grant funds for expenditures on this project."